UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| VS. § | CRIMINAL ACTION NO. 3:13-CR-16 |
| § | |
| JOHN KEVIN WALDRIP; § | |
| aka DVD MAN § | |

## **MEMORANDUM AND ORDER**

Defendant John Kevin Waldrip seeks to suppress evidence seized from his car and his home after a traffic stop in Brazoria County, Texas. Waldrip claims he was subjected to a prolonged detention that was longer than necessary to effectuate the original purpose of the traffic stop. The Government responds that (1) the officer did not detain Waldrip for an unreasonably long period of time to effectuate the traffic stop, and (2) the officer had reasonable suspicion of other criminal activity that additionally justified the duration of the stop.

### I.   BACKGROUND

The Court held a suppression hearing on October 8, 2013. At the hearing, the Government presented testimony from Officer Ian Patin, *see* Docket Entry No. 21, and introduced into evidence a certified copy of the video of the traffic stop recorded from the officer's patrol car.[1] *See* Govt. Ex. 1. Waldrip presented no

---

[1] Officer Patin's microphone was not working at the time of the traffic stop, therefore the video

testimony or other evidence. The facts below are based on the credible testimony of Officer Patin and the video recording of the traffic stop.

On August 30, 2012, Officer Patin of the Angleton Police Department was working the evening shift with his certified narcotics detection dog. Docket Entry No. 21 at 3:8–25, 5:22–6:9. As the department canine officer in the narcotics division since October 2007, Officer Patin has extensive training in narcotics investigations and has spent "hundreds of hours" training with his certified detection dog. *Id.* at 3:14–25. When he began his shift around 6 p.m. that evening, Patin learned of suspicious activity, including suspected narcotics activity, at 219 Evans Street in Angleton based on two sources—a tip from another officer and a call for service from a neighbor. *Id.* at 6:15–7:12. The other officer told Patin he had received information "about numerous vehicles coming and going throughout the night, people outside talking rather loudly at night and just suspicious activity" at the Evans street house. *Id.* at 6:19–24. Based on these two sources of information, Patin decided to patrol that area to see if he could confirm any suspicious activity. *Id.* at 7:17–23.

Around 9:30 p.m. that night, Patin noticed something he viewed as out of the ordinary for the normally quiet neighborhood—"I was patrolling on Evans in the 200 block, and as I drove by [219 Evans], I observed a minivan parked in the

provides visual evidence of the stop but does not include audio recordings of the conversations between Patin and Waldrip.

driveway with the passenger door open and two occupants sitting in the vehicle." *Id.* at 8:1–13. After conducting surveillance of the address from the end of the street, he observed the same vehicle leave the driveway of 219 Evans, and he began following it "to make sure nothing criminal that I could see was going on and possibly look for a traffic violation to further investigate what the occupants were up to." *Id.* at 8:25–9:19.

Patin observed the vehicle fail to signal a turn, so he initiated a traffic stop based on that violation. *Id.* at 9:20–10:6; *see* Tex. Transp. Code Ann. § 545.104(a) (West 2013). When Patin approached the vehicle and began questioning the driver, Defendant John Kevin Waldrip, and his female passenger, he "almost immediately" observed "nervous behavior" from Waldrip such as "[t]he shaking hands, the shaky voice, the delayed response [to my] questions." Docket Entry No. 21 at 10:13–23. Patin also suspected Waldrip might be under the influence of drugs or alcohol based on "recent wounds or scars on his arms and . . . his neck and face . . . [and] involuntary movements or jerking." *Id.* at 10:24–11:5. Based on his training and experience, Patin testified "it is common for those [scars and movements] to go together if one is abusing methamphetamines." *Id.* at 11:9–14.

After initially questioning Waldrip and obtaining his license, Patin told Waldrip he was going to receive a warning for the traffic violation "if everything else checks out" and asked him to stand outside the vehicle while he went to his

police car. *Id.* at 11:23–12:12, 28:6–7. Patin testified that informing someone who is nervous like Waldrip that he is only going to issue a warning is "an investigation technique" he uses to determine whether the person is nervous about getting a traffic ticket or about something else. *Id.* at 12:13–13:2. After being informed that he would only receive a warning for the traffic violation, Waldrip continued to display signs of nervousness, indicating to Patin that he needed to continue his investigation. *Id.* at 13:21–24, 14:7–9.

While Waldrip waited between the two vehicles, Patin went back to his police car to run license and warrant checks for Waldrip and his passenger and to start filling out a written warning. *Id.* at 19:6–12; *see* Govt. Ex. 1 at 21:45:24–49:05. The license and registration checks came back clear for Waldrip, but his passenger had a potential outstanding warrant from "a deny renewal for a fail to appear on her driver's license," so Patin called in her information to dispatch to get more information. Docket Entry No. 21 at 29:15–24.

While Patin was waiting on a conclusive answer on the passenger's license and with the incomplete written warning in his hand, he returned to question Waldrip and his passenger further. He noticed that Waldrip was "still nervous," leading Patin "to believe there's something criminal going on." *Id.* at 19:8–17; *see* Govt. Ex. 1 at 21:49:05–52:43. Patin asked Waldrip additional questions about his identifying information, his itinerary, and whether there was anything illegal in his

vehicle.  *Id.* at 14:10–14, 20:5–14, 27:14–23.  Waldrip told him he had left his residence on Evans Street and was on his way to work.  *Id.* at 37:25–38:5.  Although the residence information matched up with where Patin had been patrolling, he had "further suspicions that criminal activity may be afoot" based on Waldrip's response that he was going to work at a restaurant in Houston but had to first drop his passenger off in Conroe.  This was suspicious to Patin because Waldrip was dressed casually in shorts and it was already 9:45pm and would take about two hours for Waldrip to get to work via Conroe.[2]  *Id.* at 14:15–15:4, 29:6–10, 36:11–24.  Patin also had the passenger step out of the car to question her while he waited on the response from dispatch, who ultimately notified him that the passenger's warrant was inactive.  *Id.* at 28:15–23, 29:13–24.

Patin never issued the written traffic warning to Waldrip.  *Id.* at 15:11–19, 22:8–12.  Instead, he asked for consent to search the vehicle and Waldrip refused.  *Id.* at 15:10–12, 20:17–23.  Based on his suspicion of narcotics activity, Patin then deployed his narcotics detective dog for a vehicle sniff.  *Id.* at 15:10–16, 20:21–21:1; *see* Govt. Ex. 1 at 21:54:05.  The dog alerted toward the front of the vehicle to a narcotics odor.  Docket Entry No. 21 at 21:5–19.

---

[2] Angleton is about 44 miles south of Houston and Conroe is about 40 miles north of Houston.  Thus, dropping someone off in Conroe and then returning to Houston would be about a two hour drive.

The total time from when Patin initiated the traffic stop through when the drug dog alerted was just over 12 minutes. *See id.* at 21:20–22; Govt. Ex. 1 at 21:43:00–55:15.

Patin then searched Waldrip's vehicle based on probable cause from the drug dog's alert. Docket Entry No. 21 at 16:4–18. He found illegal contraband, including methamphetamines and allegedly counterfeited CDs and DVDs. *Id.* at 16:25–17:9, 33:10–15. Waldrip was taken into custody for the suspected possession of illegal narcotics. *Id.* at 33:16–34:18. Later that day, based on the information gathered from the traffic stop, Angleton police officers secured and executed a state search warrant at Waldrip's residence and seized computer equipment, counterfeit videos, and blank compact disks. *Id.* As a result of this search and seizure, Waldrip was indicted on the current federal charge of trafficking in counterfeit labels for copyrighted works. 18 U.S.C. § 2318(a)(1).

## II. ANALYSIS

It is helpful to first note what Waldrip is not challenging. Although the officer's motive in stopping Waldrip was the suspicion of illegal drug activity rather than the failure to signal, Waldrip concedes that Supreme Court case law allows such pretextual stops. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (noting that an officer's subjective motivation does not affect the lawfulness of a traffic stop). Second, Waldrip acknowledges that the dog sniff is not a search

within the meaning of the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005) ("[T]he use of a well-trained narcotics-detection dog . . . during a traffic stop . . . does not rise to the level of a constitutionally cognizable infringement" (citation omitted)). Finally, Waldrip concedes that once the dog alerted on his vehicle, probable cause existed for the search of his vehicle. *See United States v. Williams*, 69 F.3d 27, 28 (5th Cir. 1995) (holding that an alert by a trained drug dog can establish probable cause to search a vehicle).

Waldrip is thus challenging only what happened between the initial stop and the dog sniff—what he contends is the unreasonable length of time that he was seized on the side of the road.

### A.  Legal Principles

To prevail on a motion to suppress, the Government must demonstrate by a preponderance of the evidence that the challenged evidence was lawfully obtained. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." (citation omitted)). When a defendant contests the length of a traffic stop that was lawful at its inception, the Government must prove that the officer's actions during the traffic stop were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Pack*,

612 F.3d 341, 350 (5th Cir. 2010).  A traffic stop "may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004) (en banc); *see Pack*, 612 F.3d at 350.  During the traffic stop, "there is no question that the officer may examine the driver's license and vehicle registration . . . [and] ask about the purpose and itinerary of the driver's trip," *United States v. Fishel*, 467 F.3d 855, 857 (5th Cir. 2006); these "matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  If reasonable suspicion of additional criminal activity emerges during a traffic stop, the issue is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe,* 470 U.S. 675, 686 (1985).

Another court addressing a challenge to the amount of time it took to conduct a dog search during a traffic stop thus properly framed the issue as follows:  "If a dog sniff is conducted while someone is otherwise properly seized, such as in a lawful traffic stop, the dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop and the officer lacked an

independent reasonable suspicion to extend the stop." *United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012).

### B. Whether the Dog Search Unreasonably Prolonged The Initial Stop

In considering whether the full duration of the stop can be justified by the traffic violation, it is helpful to identify what are essentially four phases of the stop:

1. Patin initially questions Waldrip at his vehicle, obtains licenses and registration from Waldrip and his passenger, and informs Waldrip he will only get a warning. (2 minutes 30 seconds)

2. Patin runs license and warrant checks and starts a written warning in the police car, while Waldrip is standing between the two vehicles. (3 minutes 40 seconds)

3. Patin returns to get additional identification information for the written warning, to further question Waldrip about his itinerary, and to question the passenger about a potential outstanding warrant. He then asks for consent to search the vehicle and is refused. (3 minutes 40 seconds)

4. Patin returns to the police car to retrieve the drug dog and then conducts the dog sniff on the vehicle. (2 minutes 20 seconds)

Defendant's principal argument is that "[o]nce the officer ascertained Mr. Waldrip's identity and announced that he would just receive a warning, the reason for any further detention dissipated and Mr. Waldrip should have been immediately free to go." Docket Entry No. 14 at 4. But Defendant concedes the first two phases were reasonably related to the traffic stop and thus permissible. Officers are allowed to run checks of licenses and registrations as part of their investigation of a traffic stop. *Fishel*, 467 F.3d at 857; *Brigham*, 382 F.3d at 508.

Defendant thus argues that at some point during the third phase, after the license and registration checks were done but before the dog sniff began, the seizure became unreasonably prolonged.

The Court disagrees that Officer Patin had to let Waldrip go immediately after completing the license and registration checks. Patin was further questioning Waldrip about his identification information for the written warning as well as his itinerary that evening—both of which are allowed as part of an officer's investigation of a traffic stop. *See Fishel*, 467 F.3d at 857; *Brigham*, 382 F.3d at 508. Patin had started filling out a written warning and was holding it in his hand during this questioning, but never issued it. Defendant argues that Patin did not need to give a written warning; an oral one would suffice. That is certainly true, but it is also true that the officer has the discretion to give a written warning (and written warnings have benefits such as documentation of the encounter). Patin, of course, could have exercised that discretion by not stopping the vehicle at all, or on the opposite end of the discretion spectrum, he could have issued an actual citation with a fine. This does not mean that an officer can wait an unreasonably long time to "fill out a warning" and thereby indefinitely prolong a stop. But the overall length of the stop by the end of this third phase when Patin was asking Waldrip additional questions and seeking consent—approximately 10 minutes—was not unreasonable. *See, e.g.*, *United States v. Turvin,* 517 F.3d 1097, 1101 (9th Cir.

2008) ("The total duration of the stop up to the point at which Turvin consented to the search was, according to [the officer's] uncontested testimony, about fourteen minutes. This is no longer than an ordinary traffic stop could reasonably take."); *United States v. Gregory*, 302 F.3d 805, 810 (8th Cir. 2002) (finding the length of a traffic stop, including a drug sniff, reasonable where "the record indicates that just over twenty minutes elapsed from the beginning of the traffic stop to the completion of the sniff").  Because Patin was still filling out the written warning and engaged in appropriate questioning during the third phase of the stop, the Court does not believe the stop became unreasonably long at that point.[3]

A more difficult question is whether the fourth phase—the two minutes and twenty seconds when Patin conducted the canine search—was "reasonably related in scope to the circumstances which justified" the initial stop.  *Terry*, 392 U.S. at 20.  The typical roadside dog search case involves a separate canine officer arriving at the scene to conduct the search.  *See, e.g.*, *Caballes*, 543 U.S. at 406.  If that had happened here, while Patin was still working on completing the warning during the time it took for the dog to alert, the stop would not have become

---

[3] The exact timing of the resolution of the warrant check on the passenger's license is unclear based on Patin's testimony at the hearing.  *See* Docket Entry No. 21 at 28:15–23, 29:13–24 (explaining that the passenger's license "eventually" came out clear, and that he had "the passenger exit the vehicle while [he] spoke to her waiting on the response from dispatch").  If Patin received the information from dispatch that the passenger's license was clear after the dog search, then the traffic stop was not unreasonably prolonged during the search.  But the government has the burden, and it has not proved by a preponderance of the evidence that Patin received the license information after the search.

unreasonably long. The same is true if it would have reasonably taken Patin another few minutes to complete the warning had he not engaged in the dog search. If that were the case, then the roughly two minutes and twenty seconds it took for Patin to conduct the dog search did not amount to an additional intrusion on Waldrip's right to be free from unreasonable seizures beyond that the initial stop justified. But that determination involves difficult guesswork.

In a number of circuits, the couple of minutes it took to conduct the dog search would likely not be problematic under *Terry* because of what has been termed a "*de minimis*" exception. *See Turvin,* 517 F.3d at 1102–03 (discussing cases from the Eighth, Tenth, and Eleventh Circuits that "have adopted the same analysis: brief pauses to ask questions during traffic stops, even if those questions are unrelated to the purpose of the stop, may be permissible" under the Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93 (2005)); *United States v. Guijon-Ortiz*, 660 F.3d 757, 766 (4th Cir. 2011) ("[W]e have held that where a delay can be characterized as *de minimis* under the totality of the circumstances, it will not be recognized as a Fourth Amendment violation." (internal quotation marks and citation omitted)); *see also United States v. Childs,* 277 F.3d 947, 953–54 (7th Cir. 2002) (en banc) (taking a somewhat different approach but reaching essentially the same result—it is "not necessary to determine whether the officers' conduct added a minute or so" to the traffic stop, because "[q]uestions that hold

potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention"). Though the *de minimis* rule is most often applied to whether questioning unrelated to the stop amounts to an unreasonably long seizure, the Eight Circuit recently invoked it to reject an argument that the "seven- or eight-minute delay" between the issuance of a warning and the completion of a dog search unreasonably prolonged a traffic stop. *See United States v. Dominguez*, -- F.3d --, 2014 WL 341374, at *2 (8th Cir. Jan. 31, 2014); *but see Stepp*, 680 F.3d at 663–64 (finding that the "three and a half minutes" it took to conduct a canine search, coming after "six minutes of extraneous questioning," resulted in "an unreasonable expansion of the initial stop," though later finding that reasonable suspicion of other criminal activity justified the delay). The delay in this case was much shorter than that in *Dominguez* and occurred before the warning ticket had been completed. But the Fifth Circuit has not recognized this *de minimis* principle in connection with the duration of traffic stops, and this Court can avoid deciding this issue because an alternative ground for decision exists. Accordingly, the Court will not decide whether the duration of the traffic stop at the time the dog alerted was reasonably related to the traffic violation that led to the stop.

### C. Whether The Officer Had Independent Reasonable Suspicion To Extend The Stop

The Court concludes that by the end of the third phase of the stop (that is, prior to Patin commencing the dog search which raises the uncertainty discussed above concerning whether the duration of the stop was no longer reasonably related to the traffic violation), Patin had developed reasonable suspicion of other criminal activity during the stop and he "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *Sharpe,* 470 U.S. at 686.

The Government argues there was reasonable suspicion of drug trafficking at the outset of the stop because of the information from another officer and the citizen call about the home from which vehicle departed. However, the Court does not need to decide that issue,[4] because the Court concludes there was reasonable suspicion of a drug crime based on that earlier information combined with what the officer observed and heard when questioning Waldrip. The combined evidence of (1) the earlier tips, (2) Patin's observations of Waldrip's nervousness, twitching, and scars, and (3) Waldrip's response that he was leaving late at night for a worksite that was over an hour away, with a passenger who was not a coworker, while he was not in uniform, established reasonable suspicion—a threshold lower

---

[4] The Court's ruling thus does not deal with a question concerning an uncorroborated anonymous tip serving as the sole basis for reasonable suspicion. *See Florida v. J.L.*, 529 U.S. 266, 270–72 (2000).

than probable cause. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (defining the standard for reasonable suspicion as "something more than an inchoate and unparticularized suspicion or hunch" by the officer but "considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means a fair probability that contraband or evidence of a crime will be found, and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." (internal quotation marks and citations omitted)); *see also United States v. Estrada*, 459 F.3d 627, 632–33 (5th Cir. 2006) ("Reasonable suspicion does not arise solely from the inconsistent answers regarding the length of [Defendant's] ownership of the truck. . . . in this case there was significant physical evidence that, taken together with the officer's training and experience, gave rise to reasonable suspicion. . . . The adhesive marks and other scratches, together with the other evidence, do not fully exclude the possibility of innocent travel given the age of the vehicle, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.")

Defendant's reliance on the suppression holding in *Dortch* is unpersuasive—in that case the Fifth Circuit held that inconsistent statements about itinerary and the authorized driver of a rental car, in addition to the driver's nervousness, did not rise to the level of reasonable suspicion for narcotics activity. *See United States v.*

*Dortch*, 199 F.3d 193, 199–200 (5th Cir. 1999) (holding that a drug sniff initiated after a computer check of the defendant's license was completed and the defendant was told he was free to leave was unconstitutional). Here, by contrast, the earlier tips about suspected narcotics activity combined with Patin's observations of signs of methamphetamine use and Waldrip's suspicious answers about his itinerary all directly relate to and support Patin's reasonable suspicion of narcotics activity. *See Stepp*, 680 F.3d at 665–67.

Defense counsel argues that Waldrip's statement that he was driving to work late at night was plausible because he could have been going to clean up after the restaurant closed. Of course that is possible. But in looking at this from the officer's perspective—and Waldrip did not tell Patin he was conducting a late night clean up—the question is only whether a reasonable officer could view it as suspicious.[5] And the suspicious statement is not viewed in isolation, but in combination with the information that the vehicle was coming from a home where drug trafficking was suspected as well as Patin's observations of Waldrip's nervousness, twitching, and scars.

---

[5] At the hearing defense counsel elicited testimony that the vehicle Waldrip was driving was registered to a restaurant chain based in San Antonio. Docket Entry No. 21 at 36:1–9, 38:6–14. Based on this, defense counsel argued that Waldrip's explanation that he was going to work at a restaurant was true. But the fact that the car was registered to the restaurant does not conclusively establish that Waldrip was using it to travel to work the night he was stopped.

III. **CONCLUSION**

For the reasons stated above, the Court concludes there was no Fourth Amendment violation. Accordingly, Defendant's Motion to Suppress (Docket Entry No. 14) is **DENIED**.

**SIGNED** this 19th day of February, 2014.

_____
Gregg Costa
United States District Judge